Zuckerman representing Petitioner Johnny Riley in this case. And I'm hoping to save about five minutes for rebuttal if I could. I'd like to focus today on the ineffective assistance claim because I think it's the more straightforward one. I say that because there's no allegation of any procedural bar. There's no question it's based on clearly established law. And the facts regarding that claim I think are relatively simple because so much is undisputed here. There's no question that Mr. Riley shot Aaron Calloway. The only question was who started it. According to — I'm sorry, he shot Gustavo Jaramillo. The other partner of Mr. Jaramillo was Aaron Calloway. The only question was who started it. Was Mr. Riley responding to a threat to shoot him, or did he, as Mr. Calloway claimed, just arrive, guns a-blazing, with the very purpose of stealing or robbing Mr. Jaramillo of his gun? Let's assume that Mr. — how do you pronounce his name? Mr. Jaramillo? Jaramillo. I only know what I've seen in writing, too, Your Honor. Jaramillo. Let's assume that he said — when he's called a wannabe, he says, you think I'm a wannabe? I'm going to shoot you. Or he says, you're dead. Or he makes some or Riley shooting him, right? He would have to pull a gun on Riley to justify Riley shooting him. Well, but perhaps, Your Honor, but again, it's — But you're saying perhaps. Isn't it — wouldn't it — I mean, can't we agree that if all this young gang member did was threaten Riley, I'm going to shoot you, that Riley could not shoot him in self-defense in response to that? I actually — Do you not agree with that? I disagree with that. I mean, if someone comes up to you — I can't wait to hear your argument about it. If someone comes up to you and says, I've got a gun in my pocket right here. I am going to shoot and kill you right now, and says it in a believable voice, you have — absolutely have a right under Washington law to shoot first. Okay. In fact, though, that's not quite the fact, because it's undisputed that Riley did not immediately shoot. It's undisputed that what he did was pull his own gun, point it towards Jeremio and say, give me your gun before I walk away from you and let you shoot me in the back. I want you to give up your gun. And Jeremio kept saying various lies, trying to distract him, and made a move towards his gun. And what's the gravamen of your ineffective assistance? His failure to interview Pettis? Yes, his failure to interview and pull — Look, I'll tell you the problem I have with that is it appears that Pettis says in his own declaration that he ran away. And so he really didn't see anything. He wasn't there, except at the time the statement was made about people getting mad, they started threatening Riley. When one of them said he was going to shoot Riley, I ran away. So doesn't he think that that was an unreasonable analysis that the Washington courts did? No, I disagree with that, Your Honor. Didn't the Washington State Commission also say that? He wasn't there. He did say that, but I think that was an unreasonable analysis that the Washington courts did. There — as far as the part that Mr. Pettis missed, there was no dispute. I mean, both sides agreed on what happened from the moment Mr. Pettis ran away. There was no dispute that from the moment Pettis ran away, Johnny Riley did pull his gun, pointed at Mr. Jeremio, say, give me your gun, and then ended up shooting after Jeremio made a move towards his gun. Both sides agreed to that. The government agrees that Jeremio made a move towards his gun? Well, there only — I thought that he just made some movement. He's lying on — he's lying on the ground, the gun's in his pocket under his thigh is what's something I read in one of the opinions. Mr. Calloway, the only State — Mr. Jeremio said he didn't remember. Mr. Calloway, his partner in crime, agreed on cross-examination that just before Riley shot, Jeremio did turn — make a move or turn his hip towards his hip. But you may want to stay close to that mic. Oh, I'm sorry, Your Honor. Isn't that the key? And Pettis was gone by then. Pettis was gone by then, right? But what I'm saying, Your Honor, is that both sides agreed to what happened after Pettis left. There wasn't any significant dispute over what happened from the moment Pettis left. So it was all verbal until Pettis left? Well, all verbal — right, verbal except that what was coming verbally from the gang members was a credible threat of imminent serious bodily harm. Certainly not First Amendment protected speech. To credibly say to someone, I've got a gun and I'm going to shoot you right now, is not protected speech. What Mr. Riley said was protected speech. I mean, what he says, you're a wannabe. Everyone has a right to say you're a wannabe. You don't have a right to say to someone, I've got a gun in my pocket, I'm going to shoot you right now. I'm a gang member. What do you mean, what do you mean prospective speech? Protected speech. You mean the government can't stop them from saying it? What do you mean protected speech? And perhaps I'm probably really using those words because of the second issue in this case. But you have a First Amendment right to say things to someone like, I think you're a wannabe. You don't have a First Amendment right to say to somebody, I'm going to shoot you right now. But First Amendment aside, and more specifically — If somebody says something to you you don't like, you can sue them for — The First Amendment protects that against private reprisals? Well, again, I wasn't going to argue the big First Amendment issue here. But that issue in this case — the issue in this case is whether Mr. Riley was deprived of his right to self-defense because of his First Amendment protected speech. For purposes of the ineffective assistance issue with Mr. Pettis, the crucial point is that if Mr. Riley's testimony is accepted, he drew his gun only after being threatened with a credible threat that he himself would be shot. So Pettis would have testified to the statement by RMEO that he — as you characterized  it, very much in dispute. I mean, that was the heart of this case. Mr. Callaway was claiming that Johnny Riley just walked up with his gun drawn from the start with the purpose of stealing RMEO's gun from him. Under those circumstances, Riley can't even claim self-defense. He is a first aggressor under Washington law. He has no right to self-defense. Riley's claim was — Is he a first aggressor — or is he a first aggressor if he pulls his gun and points it at this other man first when the other man's only threatened him verbally? I guess you're saying he's not, that the man who says, I'm going to shoot you is a first aggressor. Right. No. Not if the other — Do you have a question for the jury? I mean, you had a jury and they had instructions. He was the first aggressor. So why doesn't that resolve the case? The jury — Let me make sure I understand your question. The jury decided not to give your client a self-defense. They did have a self-defense instruction, right? Oh, certainly they did. They had a first aggressor instruction. They did. And we can't be sure precisely what the jury based its decision on, but the jury may well have been swayed by Aaron Calloway's testimony, at least to some extent. Calloway's testimony being that Riley drew his gun before there were any threats from the others. In fact, Calloway denied that he or Jeremio ever threatened to shoot Mr. Riley. The jury might — may well have been swayed by that testimony. Essentially, it was a credibility contest between Riley and Calloway. Jeremio — to a lesser extent, Jeremio, because he disclaimed memory of most of what happened. And if, in fact, Mr. Riley's telling the truth, that he's having a friendly conversation until these two gang members start threatening to shoot him, and then he pulls his gun. No, he is not the first aggressor then. A credible threat to shoot someone would — is an aggressive act and would be — would make Calloway and Jeremio the first aggressor. So the — the point is that Pettis saw the key event, the part that matters. It's like the — well, there's a scene from the movie Butch Cassidy and the Sundance Kid. Butch Cassidy goes up to a fellow named Logan and knees him in the groin, I suppose seemingly guilty of assault, except that perhaps Sundance could verify that Logan had just threatened to kill Butch with a knife, just seconds before Butch knees Logan. I mean, that's the critical issue. Why don't we hear from the other side, and we'll give you a chance to respond. Very well, Your Honor. So much for Butch Cassidy. May it please the Court. I'm John Sampson, Assistant Attorney General, representing the Respondent. The standard that this Court must apply under 2254d is whether the State court decision that there was no ineffective assistance to counsel, was that decision objectively unreasonable? And that standard is higher than a clearly erroneous standard. And in this case, Petitioners failed to show that the State court's decision was objectively unreasonable. Therefore, the District Court properly denied the ineffective assistance. You're saying if the State court said it wouldn't have made any difference to call Pettis? The State court said it wouldn't have made a difference. There was no showing of prejudice, because there was not a reasonable probability it would have affected the jury's verdict. And the State court also found that he had failed to show deficient performance. And addressing the prejudice issue, it is because Mr. Pettis ran away. He ran away when the threats were made. Well, if I tell somebody, I'm going to shoot you, could that possibly be a ground for the person to shoot me in self-defense before I shoot him? No, Your Honor. I would submit that under Washington law, mere words are not a basis to shoot someone. They're not a basis to use. What's the case, Washington case, that determines that? Your Honor, I'm sorry, I do not have that cite. I believe it is cited in the State court opinion, the court of appeals decision in this case, I believe does cite it. But the standard is both a subjective and an objective standard. You have to have a subjective standard that you are in danger of imminent... Well, if the gangbanger says, I'm going to shoot you, I think I'm in real big trouble. But then it also has to be objectively reasonable. Would an objective person in that position believe they're objectively... Would it be objectively reasonable that they're... You don't think this crowd says, I'm going to kill you? So it's objective to think you're in big trouble? Not enough to actually shoot somebody, no. Are you serious? Yes, Your Honor. Do you know who these people are? I do, Your Honor. Who are they? They are gang members or gang wannabes. Dangerous. But that is not... That's all we hear from authorities. The most dangerous people except for the Al-Qaeda are the gang members in the cities. I understand that, Your Honor, but that does not allow people to shoot one another. Otherwise... According to the Washington opinion, if this is the court of appeals, that's the one you're referring to? Yes, Your Honor. It says, although actual danger need not be present, a defendant must show that aggressive or threatening behavior, gestures, or communication by the victim preceded the defendant's use of force in order to show that the defendant had reasonable grounds to believe there was imminent danger of great bodily harm. State versus Therof. Yes, Your Honor. That says communication by the victim could be sufficient to create reasonable grounds to believe there was imminent danger of great bodily harm. So speech alone, in fact, could, under Washington law, be enough. If this is the only authority you've got. That is the authority, Your Honor. Okay, so if, as Judge Trott says, he's a known gang member, and I have reason to believe he's got a gun in his pocket, and he says, I'm going to shoot you, I bet if you were defending state troopers, you would be arguing that they had reason to believe that they were in imminent danger of personal harm or harm to others, and it was a justifiable shooting, correct? On mere words alone. I bet you would. In a police case, yes, you would. Your Honor. I've seen it many times. It is an issue for the jury to decide. The jury rejected it. But I think what's even more important, and the second part of my argument on this is that there was testimony to corroborate the petitioner's testimony regarding the threats. On cross-examination, and this is at Clerk's Record 14, Exhibit 20, pages 124 to 128, on cross-examination, Mr. Colloway, he admitted that these type of statements were made and that threats were made, and he admitted that they were gang members and that they did have guns and that they could be, they would react in a threatening manner to the term wannabes or to insults from another person. So there was corroboration. The issue on the ineffective assistance of counsel claim is would have Pettis' testimony made a difference, and it would not have because he ran away when that threat was made. So there's already testimony to corroborate. The argument here is that it was what happened before he ran away. That is, was Riley in a position, based on statements of Jaramillo or Jaramillo, sufficient to meet the oral communication that put defendant in a position where he had reasonable grounds to believe there was imminent danger of great bodily harm. So that can be before because if Pettis was in fear of great bodily harm and ran, then arguably Riley, with a gun, took a different action, and then the issue would be whether it was reasonable. And that issue was to corroborate exactly what they heard Jaramillo say, right? But Mr. Colloway, on cross-examination, did corroborate Mr. Riley's statements. Therefore, Mr. Pettis is okay. Did Jaramillo, and I may be mispronouncing it, Jaramillo. The victim? Yeah. Did he testify or did he say he didn't remember? In other words, did he say I threatened Riley? If he said I threatened Riley and Colloway said Jaramillo threatened Riley and Riley said I threatened Riley, it would seem to me, I mean, and Riley said he threatened me, then I would think Pettis' knowledge of that would be somewhat cumulative. But if Jaramillo denied it, said he didn't remember, it might be significant. Your Honor, in honesty, I did not review the victim's testimony yesterday in preparing for argument. I should have. I did review Mr. Colloway. So I don't recall. I think I have no reason to dispute Petitioner's statements that his testimony was essentially I don't remember what happened. But clearly, Mr. Colloway did, who was the other person there present, did corroborate Mr. Riley. Mr. Pettis, on the other hand, even if they could show prejudice, there's still the reasonableness prong. And if the State court decision is objectively reasonable, that there was a basis not to call him as a witness. He was he could be seen as an accomplice of Mr. Riley. He was Mr. Riley's friend. He had a criminal record. And as this Court stated in Dows v. Wood, which is cited in our brief, those are reasons for an attorney to decide not to call a witness. Petitioner may argue that under Lord v. Wood, because he didn't interview Mr. Pettis, that eliminates any analysis into the reasonableness of counsel's competency. But Lord v. Wood involved a situation where the alibi witnesses who were not called were unbiased. They had no criminal records. They had no connection to the defendant at all. And in that case, the Court determined it was unreasonable not to call them. All the witnesses in this case are living in or on the edge of the world of gangs and criminality. So what's the difference if they call them in that respect? Because they could bring up his criminal record on impeachment. They could inquire into the bias. He was Mr. Riley's friend. That would weaken his testimony. There's a reasonable strategic – there's a strategic reason for not calling him as a witness. Kennedy. Facts in the record fully developed so that relief one way or the other, either for Petitioner or for the State, should be given here? Or is there anything that could be brought out in an evidentiary hearing in the district court that we don't know now? If the Court were to determine that the State court decision is objectively unreasonable, the issues that could be further developed would be the counsel's actual thought processes of why he did or did not. Did he say, I had a strategic reason for not interviewing Pettis? That is not in the record, Your Honor. I know. It's not in the record at all. That's correct. So we do not know why he did not. But the State found that there – or the State court found that there was reasons that he would not have called him. Do you have any other points you'd like to make? No, Your Honor. All right. We would ask that the Court affirm the district court. Thank you. Thank you, Your Honor. I think most importantly, I have to disagree with counsel's characterization of Aaron Calloway's testimony, suggesting that he somehow agreed with Mr. Riley's version. Aaron Calloway's testimony was that Johnny Riley approached, guns a-blazing, saying, get down at the ground, I'm robbing you. I mean, he came at them with his gun out to rob them, obviously making him the first aggressor and depriving him of any self-defense. I mean, that's the critical dispute here. Did Johnny Riley come running at these guys with his gun out, with the initial intent to rob them? Yeah. And Pettis is gone by then. Oh, no, Your Honor. Pettis was there at that point. Absolutely. Pettis was there. How do we know that? He says, I heard some threats and I took off. He says – Does he say, I saw them, Riley go at him with a gun to rob him? No. What I'm saying is, Calloway – Does he say he saw Riley go at him with a gun to rob him? Oh, he says Riley didn't. Let me make it clear what I'm saying. Calloway is saying the initial interaction, from the very beginning, Riley comes at them with a gun out to rob them. I mean, they're just standing there waiting for a bus and here comes Riley with a gun? Yes. Or was there some verbal confrontation? There had been some – Pettis said Riley was going to – or did Riley testify that he wanted to buy a car for his father? Yes. These guys have stolen cars, maybe, or something like that, and he's going to talk to them about buying a car for his father? And then he calls the guy a wannabe and then he gets threatened and then he pulls his – I think I should make the facts clear. By both accounts, the two parties met twice that day. Earlier in the day, there was, by all accounts, a peaceful interaction. But then, with at least an hour or so in between, there's the second interaction. And in the second interaction, according to Calloway, Riley just comes right out, gun out, I'm robbing you. Pettis is there at the onset of the second interaction. Does he say I saw that? No, he says it's not true. Pettis says that's absolutely false. Pettis says I heard some threats and I took off because these are dangerous guys. So what Pettis would say is that before any gun was drawn, there was an interchange. What Pettis would say is this is an absolute lie that Calloway is saying. Pettis would tell the story as he said he understood it, that when they came back the second time, that Mr. Riley called these young kids wannabes. Well. And then Mr. Riley was threatened by young or real. But more significantly, Pettis would confirm that they approached Calloway and Jeremio peacefully with the purpose of talking about buying the car. But they would say that Riley said you guys are wannabes and then a threat was made and then he ran. Right. He ran when it was clear to him that there was a serious threat that they were going to get shot. Couldn't it very well have been at that time that Riley approached with the gun, as Calloway said? It's undisputed. Absolutely that's what happened. Everyone agrees that's what happened. That the minute Pettis ran away, there's no dispute. At the moment that Pettis ran away when the threats were made and at that moment Riley did not run, he testified that he had once tried to walk away from a man with a gun before and got shot. So assuming that what Pettis would have said might have been relevant to a jury, which the State court thought it wasn't, but assuming that it might have been, before one could say that the lawyer was deficient in not calling him, wouldn't there have to be a hearing where the lawyer could explain why he didn't call him? And perhaps an evidentiary hearing would be a good idea. I asked for one in the district court. I asked for one in the State court. And I didn't get one in either court. And I think that that may be the course that this Court wishes to take, because to suggest that counsel had a strategic reason for failing to call him. We don't know that. Right. We have no basis for that. And that, you know, for the State court. It might be a proper suggestion. We just don't know. Right. We don't know what the record doesn't tell us. Right. I mean, we do have the State court. Maybe you know or maybe your colleague knows for the State, but we can't know because it's not in the record. I agree. Have you talked to counsel and asked him why didn't you call Pettis? Have you talked to counsel? I want to be sure I give an accurate answer to that. Okay. Now you're going to parse things. Did you talk to him about this or not? Let's not play games. Did you talk to him about it or not? I don't believe I ever did. But you're not sure. I'm pretty sure I didn't. I'm pausing just because I'm having to remember back several years now and I don't want to give an inaccurate answer to the court. I'm pretty sure I never did ask him that. I asked him for his file. And I know that if his file had indicated one way or the other, I don't believe there's anything in his file that suggests that he ever contacted him. And I don't believe he ever suggested to me that he had a reason. All right. Counsel. Are we done? Thank you, Your Honor. Thank you very much. The case just argued is already submitted. We'll go to the last case on the calendar, which is Steve Adering Services v. Errol Price. Thank you, Your Honor.
judges: Trott, Fisher, Gould